IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| DOUGLAS S. RAE | : | No. 15-432 |

**MEMORANDUM**

PRATTER, J.                                                                AUGUST 6th, 2020

Douglas Rae moves for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i), claiming that his health conditions of arrythmia and pre-diabetes place him at a high risk of severe illness in the wake of COVID-19. He seeks immediate release from FCI Schuylkill. The Government opposes and contends that extraordinary and compelling reasons do not exist to reduce Mr. Rae's sentence.

For the reasons that follow, the Court denies the motion.

**BACKGROUND**

**I.     Mr. Rae's Criminal Conduct**

Mr. Rae was charged with and ultimately convicted of mail fraud, wire fraud, and money laundering arising out of various schemes to steal more than $1.8 million from his employer, QVC. Mr. Rae's criminal conduct spanned a six-year period during which he submitted false invoices to QVC for goods that were never delivered and services that were never performed. Mr. Rae used this money for personal and often elaborate expenditures, including, but certainly not limited to, jewelry, home renovations, yachting and golf club memberships, and payments for multiple vacation homes.

The Court noted this lavish behavior and an accompanying lack of remorse at Mr. Rae's sentencing. Mr. Rae's presentence report stated that Mr. Rae described himself as in overall good health, and that he was not under physician care or taking any prescription medications. The Court sentenced Mr. Rae to 78 months of imprisonment, $1,804,058.85 in restitution, and a $10,000 fine. He is currently serving his sentence at FCI Schuylkill.

## II.   Mr. Rae's Medical Records

The Government has provided Mr. Rae's medical records from the BOP since 2018. These records reflect that Mr. Rae is pre-diabetic. However, neither the Government nor the Court was able to locate any mention of arrythmia or cardiac disease in Mr. Rae's records. Rather, his medical records note no existing cardiovascular disease or hypertension. As a whole, Mr. Rae's records demonstrate that he is in overall good health.

## III.   FCI Schuylkill's Response to the COVID-19 Pandemic

Because "maintaining safety and security of [BOP] institutions is [BOP's] highest priority,"[1] BOP has taken significant measures to protect the health of the inmates in its charge. BOP's Pandemic Influenza Plan has been in place since 2012. BOP HEALTH SERVICES DIVISION, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited August 1, 2020). The protocol set forth in this plan established a multi-phase framework which requires BOP facilities to begin preparations in the face of a "[s]uspected human outbreak overseas." *Id.* at i. This plan further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

---

[1]   BOP, *Updates to BOP COVID-19 Action Plan: Inmate Movement* (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited July 29, 2020).

BOP began planning for potential transmissions related to COVID-19 as early as January, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions. Now in Phase Seven of the Action Plan, every BOP institution requires all inmates to be secured in their assigned cells/quarters. Limited group gathering, with social distancing to the extent possible, is permitted to facilitate commissary, laundry, showers, telephone, and computer access. BOP is working to distribute face masks to all staff and inmates and encourages face coverings be worn in public spaces when social distancing is not feasible. Excluding medical treatment and similar exigencies, BOP has substantially limited the movement of inmates and detainees among its facilities. Official staff travel has also been cancelled, as has most staff training.

Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the Centers for Disease Control and Prevention's (CDC) criteria for release from isolation. All facility staff are screened for symptoms in areas with sustained community transmission. Staff exhibiting a fever of higher than 100.4 degrees Fahrenheit are barred from entering the facility. Similarly, staff members exhibiting a stuffy or runny nose can be placed on leave. Only contractors performing essential services or the necessary maintenance on essential systems may access BOP facilities. Moreover, all volunteer visits have been suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer accessing BOP facilities will accordingly be screened for symptoms and risk factors. As of March 13, 2020, social and legal visits were suspended, with facilities permitting only case-by-case

accommodations for visiting attorneys after the attorney has been screened for infection. BOP has increased telephone minute allowances to counteract these limits on in-person interactions.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[2] Pursuant to the Coronavirus Aid, Relief, and Economic Security Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). BOP has transferred more than 7,000 inmates to home confinement since March 26, 2020.

All of the measures discussed have been implemented at FCI Schuylkill, which houses 1,029 inmates. As of July 27, 2020, the date on which the Government filed its response in opposition, there has been only one reported positive case of COVID-19 in the FCI Schuylkill inmate population.

### LEGAL STANDARD

At the outset, the Court notes that Mr. Rae's *pro se* motion should be "liberally construed." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). "[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). A defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf, which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion

---

[2] This authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

4

on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A).[3]

In the event the moving defendant complies with the exhaustion requirement, a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction and that the reduction is consistent with the Sentencing Commission's applicable policy statements[4] and only after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13.2.

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the term. The application note provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). To find compelling and extraordinary reasons, the policy statement additionally requires a court

---

[3] The Government does not raise an exhaustion argument in its opposition.

[4] Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," this Court recently concluded that "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, No. 03-271, ___ F. Supp. 3d ___, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it also "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at *4.


to find that a defendant is "not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899) (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014)).

### DISCUSSION

Mr. Rae moves to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A)(i). He asserts that he has been diagnosed with arrhythmia and is pre-diabetic, conditions he contends place him at high risk of severe illness were he to contract COVID-19. He also claims that the conditions of his open dorm style housing make social distancing impossible and, as of the date of his motion, the hand sanitizer station has been empty since March 26, 2020. Furthermore, Mr. Rae states that the exhaust fans in the communal bathrooms are not functioning, that high-touch surfaces are not being sanitized, and that outside vendors and guards are failing to adhere to mask-wearing requirements. Mr. Rae also asserts that he has served more than three years of his sentence, that with assistance from the First Step Act of 2018 and good time applied he will be eligible for release later this year, and that he has spent his time at FCI Schuylkill constructively by completing

classes, establishing a Spanish program syllabus, instructing a group of 20 inmates, and maintaining a fulltime job as a general maintenance employee.

Before addressing the arguments and the evidence, it bears recognizing the unprecedented magnitude of the COVID-19 pandemic. Indeed, to the extent correctional facilities may have successfully dealt with past viruses and outbreaks of communicable diseases, those diseases pale in scope with the apparent magnitude and speed of transmission of COVID-19 and the challenges associated with it. This virus comes in the form of a world-wide pandemic, resulting in a declaration of a national emergency and states of emergency by many states, along with various forms of business closures or modifications to operations and stay-at-home orders. Without known effective treatment at this time, and vaccines months (or more) away, public health officials urge people to practice "social distancing,"[5] frequent and thorough hand-washing, avoidance of close contact with others, and wearing masks during public interactions—all of which are understandably difficult to implement in a correctional or detention facility. Certainly, the Court takes this critical health risk seriously. But as concerning as the common calamity of COVID-19 is, resolving Mr. Rae's motion still calls upon the Court to seriously take into consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Turning to Mr. Rae's individualized medical concerns as they relate to COVID-19, the Court concludes that his status as pre-diabetic and his alleged arrythmia do not present extraordinary and compelling reason to reduce his sentence.

The CDC advises that "serious heart conditions," specifically heart failure, coronary artery disease, cardiomyopathies, and pulmonary hypertension, increase the risk of severe illness from

---

[5] Some have understandably suggested that this would be better thought of as "physical distancing," insofar as it is also strongly urged that maintenance of social interaction remains important for purposes of counteracting the negative emotional aspects of isolation.

7

COVID-19. *See* CDC, *Serious Heart Conditions and Other Cardiovascular and Cerebrovascular Diseases*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited August 1, 2020). Arrythmia does not fall into one of these categories. Although the CDC recognizes that "[h]aving other cardiovascular or cerebrovascular disease . . . may increase [the] risk of severe illness from COVID-19," *id.*, such other cardiovascular diseases are not considered high risk. Furthermore, even if arrythmia did qualify as a high risk factor for COVID-19, which the Court emphasizes it does not, the Court has not uncovered any history of arrythmia or cardiac disease in Mr. Rae's medical records.

With regards to Mr. Rae's pre-diabetes diagnosis, the CDC states that type 2 diabetes increases a person's risk of severe illness from COVID-19, while type 1 diabetes may increase a person's risk. *Id.* Pre-diabetes, however, is not listed by the CDC as a condition that increases the risk of COVID-19 complications. *See United States v. Livingston*, No. 18-416, 2020 WL 1905202, at *3 (E.D.N.Y. Apr. 17, 2020) ("[N]othing in the guidelines promulgated by the [CDC] suggests that pre-diabetes puts one at a higher risk for severe illness from infection. Indeed, while diabetes is on the CDC's list of high-risk medical conditions, pre-diabetes is not.").

In light of the CDC guidelines, the evidence does not support a finding that Mr. Rae is at a higher risk for severe illness due to COVID-19. With only one reported positive inmate case of COVID-19 out of a population of 1,029, FCI Schuylkill appears to be responding to and defending against the threats of the virus in a vigorous and generally effective manner. *See United States v. Berry*, No. 10-051-1, 2020 WL 4035457, at *3 (D.N.J. July 17, 2020) ("[G]iven the markedly restrained progression of the virus within FCI Schuylkill, as compared to within the Delaware Valley region generally, BOP's Action Plan appears to be having a positive impact."). Although

8

the Court in no way trivializes Mr. Rae's health conditions, such ailments, coupled with the present conditions at FCI Schuylkill, do not establish extraordinary and compelling reasons justifying his early release. In the absence of individualized risk, COVID-19, on its own, is not enough to justify compassionate release. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").

Therefore, the Court finds that Mr. Rae has failed to meet his burden in demonstrating that extraordinary and compelling reasons justify the reduction of his sentence. Accordingly, he is not entitled to relief pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Rae's motion to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). An appropriate Order follows.

BY THE COURT:

*/s/ Gene E.K. Pratter*

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**